IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

KAYLA HOMINSKI and                                    Case No. 1:24-cv-21590-KMM/ELFENBEIN
NICHOLAS HOMINSKI,
     *Plaintiffs*,

v.

GUSAR, LLC; COLSEN FIRE PITS, LLC;
WAYFAIR LLC; and NIKL Partners, LLC
     *Defendants*.                       /

**DEFENDANT WAYFAIR LLC'S MOTION TO DISMISS FOR FRAUD ON THE COURT**

### I.    **INTRODUCTION**

Plaintiffs' theory of liability in this matter rests almost entirely on their contention that no visible flame was present when Plaintiff Nicholas Hominski ("Nick") poured 99.9% isopropyl alcohol onto the fire pit, and that a subsequent flame-jetting event caused Plaintiff Kayla Hominski's ("Kayla") injuries. However, the only two eyewitnesses to the accident, other than Plaintiffs, gave statements to Delaware State Fire Marshal William Goins immediately after the accident, one at the scene itself, and the other at the hospital.  Both of these contemporaneous eyewitness statements confirmed that the fire was still burning when Nick poured alcohol on it.

Plaintiffs then worked directly with their former outside counsel on an "unconscionable scheme"[1] to alter the only fact witness testimony concerning the central liability issue in this case. Together, they replaced the witness's contemporaneous accounts with a litigation-created narrative that there was an "invisible" flame present when Nick poured alcohol on the already burning fire pit. Plaintiffs' counsel met with these witnesses before their depositions, showed these only witnesses expert-created videos and documents, and even joked afterward that he had "wined and

---

[1] *See Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989), discussed *infra* at Section III.

dined" them. Specifically, he showed the witness expert-created videos, told them they had observed an "invisible flame," and provided them with post-accident recall materials and expert-generated demonstrations purporting to show "invisible flames," and flame jetting.

Plaintiff Kayla's contemporaneous text message and cell phone voice notes clearly document her own participation in this scheme, including by repeatedly texting friends and family that Greg's contemporaneous statement of the accident was wrong, discussing her attorneys' plans to "prove" facts to him and "massage" his understanding of what occurred, and personally explaining how counsel intended to convince Greg that what he observed was not what actually happened. Because Plaintiffs themselves played a central role in working with their former counsel to improperly coach the only independent eyewitnesses concerning the central liability issue in this case, and then improperly relied on that testimony to challenge the contemporaneous evidentiary record, dismissal is the only sanction sufficient to protect the integrity of the judicial process and to prevent prejudice to Wayfair.

## II.   FACTUAL BACKGROUND

### A.   Plaintiffs Allege the Accident Occurred Because No Visible Flame Was Present When Nick Poured Alcohol on the Fire Pit.

Plaintiffs Kayla and Nick allege that Kayla sustained burn injuries involving a Colsen Fire Pits, LLC-branded ("Colsen"), Gusar, LLC-manufactured ("Gusar") tabletop fire pit sold by Wayfair LLC ("Wayfair"). *See* Amended Complaint, ECF No. 30. According to the Amended Complaint, in the early morning hours of July 15, 2023, Plaintiffs and their friends, Greg Ferraro ("Greg") and Kayla Ferraro ("KF"), the only independent eyewitnesses to the accident, were gathered on Plaintiffs' backyard patio when Nick poured 99% isopropyl alcohol in an effort to "refuel" the fire pit. *Id*. Plaintiffs contend that no visible flame was present when Nick poured alcohol onto the fire pit, and that a subsequent flame-jetting event caused Kayla's injuries. *Id*.

Central to Plaintiffs' theory of liability is their contention that the fire pit appeared extinguished and that no flame was visible at the time Nick attempted to refuel it. *Id*.

### B. The Only Eyewitnesses to the Accident Immediately Reported to the Fire Marshal That the Fire Pit Was Still Burning When Nick Poured Alcohol on It.

Fire Marshal William Goins conducted a contemporaneous investigation of the accident on the day of the accident. As part of that investigation, Fire Marshal Goins separately interviewed Plaintiffs' friends, Greg and KF, the only independent eyewitnesses to the accident. Greg told the Fire Marshal that the fire was "**almost out but still burning**" when Nick "tried to refill the burn pit with alcohol from a container." *See* Fire Marshal Goins Report, **Exhibit A**. In a separate interview, KF independently stated that the fire pit **"was almost out,"** and that Nick "**started to refill the device while it was still burning**." *Id*. After interviewing witnesses, examining the scene, and evaluating the physical evidence, Fire Marshal Goins concluded that the **cause of the accident** was "accidental, **liquid fuel poured onto open flame**." *Id*. Fire Marshal Goins further documented that the physical evidence at the scene matched the witnesses' descriptions. *Id*.

### C. Every Contemporaneous Record Corroborates the Eyewitnesses' Accounts.

The statements provided by Greg and KF to Fire Marshal Goins are consistent with every contemporaneous record generated immediately following the accident, all of which state that the fire pit was still burning when Nick poured isopropyl alcohol on it:

- Kayla "was standing next to a gas fire pit when **someone threw rubbing alcohol onto the fire**." Records from Delaware State Police, attached as **Exhibit B** (emphasis added)
- The parties "ha[d] been drinking most of the day and **attempted to increase the size of a gas log fire pit by throwing rubbing alcohol into the fire**." Records from Sussex County EMS, attached as **Exhibit C** (emphasis added).
- "**[R]ubbing alcohol was poured onto fire**" immediately before the accident. Lewes Fire Department Records, attached as **Exhibit D** (emphasis added).
- Plaintiffs "had been drinking around a bonfire when **an accelerant was poured over the fire** and subsequently lit her on fire." Records from Crozer Chester Medical Center, attached as **Exhibit E** (emphasis added)

D. **Plaintiffs' Former Counsel Controlled Access to the Only Independent Eyewitnesses Before Their Depositions**

Plaintiffs filed suit on April 25, 2024, and, on July 1, 2024, served their Rule 26(a) Initial Disclosures, which identified Greg and KF as individuals with discoverable information concerning the accident, and further directed that Greg and KF be contacted only through Plaintiffs' counsel. *See* **Exhibit F**.  Jacqueline Promislo, counsel for Wayfair, then emailed Plaintiffs' counsel at that time, Stuart Ratzan ("Attorney Ratzan") and Mario Giommoni ("Attorney Giommoni"), and specifically asked whether they represented Greg and KF. *See* November 5, 2024 email, **Exhibit G**. Rather than providing a response, Attorney Ratzan emailed to call him. *Id*. During their telephone conversation, Attorney Ratzan specifically advised Attorney Promislo that his firm represented Greg and KF. Declaration of Jacqueline Promislo ¶ 3, **Exhibit H**. Based upon Attorney Ratzan's representations and the direction contained in Plaintiffs' Initial Disclosures, Wayfair understood that it was not permitted to communicate with Greg and KF, and therefore did not contact them prior to their depositions. *Id*. at ¶ 4.  Plaintiffs' counsel then met with the witnesses before their depositions, bought them dinner, showed them expert-created videos, post-accident CPSC recall documents, and coached their testimony. *Id*. at ¶¶ 6-8.

Notwithstanding Attorney Ratzan's representation that his firm represented the Ferraros, at the outset of her deposition, KF testified that she was not represented by counsel. *See* KF Tr. at 7:2-4, **Exhibit I**. Plaintiffs' counsel therefore improperly prevented Wayfair from communicating with the only independent eyewitnesses.

E. **Plaintiffs and Their Former Counsel Worked Together to Improperly Coach the Only Independent Eyewitnesses and Convince Them That Their Contemporaneous Statements Made to the Fire Marshal Were Wrong.**

Fire Marshal Goins' Report, prepared the morning of the accident, contains Greg's contemporaneous account of the accident, which contradicts Plaintiffs' legally constructed theory that the fire pit was no longer burning, and that this accident was the result of flame jetting. Plaintiff Kayla repeatedly communicated by text message to her friends, her lawyers, and her various chat groups, and told them that Greg's understanding of what he observed was wrong because he did not understand invisible flames and flame jetting.  She further discussed that her lawyers would explain to Greg why what he told the Fire Marshal was incorrect, so that he would provide different testimony at his deposition. Specifically, Kayla stated:

> Stuart [Plaintiffs' attorney] called Nick now … **Greg is worried he may have told the cops** … **that Nick lit it on an open flame**. But it's bc he has no idea what that product actually does (aka burns invisible flames) etc. so **Stuart's gotta talk to him next week** I believe. But I guess **Greg's worried he may have said the wrong thing and he doesn't want to lie lol Stuart's like he isn't gonna lie he just didn't know what we now know to be true**."

*See* October 23, 2024 text message, **Exhibit J**.

On October 24, 2024, Kayla sent a voice note to her friend Elisa DiCarlo describing a Zoom meeting with Attorneys Ratzan and Giommoni. *See* Notarized Transcription of October 24, 2024 Voice Note[2], **Exhibit K**. In that voice note, Kayla explained that Greg was concerned because there was already "something on paper" documenting that he saw Nick pour fuel onto a flame, and he did not want to provide testimony inconsistent with that prior statement. Kayla then reported that, rather than determining whether Greg's original account was accurate, counsel instead reassured Greg that he was **"not under oath"** when he made the statement to Fire Marshal Goins:

> [H]e's afraid that he may have said something to the cop, which there was no cop, actually, so the Fire Marshal or something … that there's something on paper that says he saw Nick pour

---

[2] The audio recording, **Exhibit Z**, will be filed with the Court in accordance with the Local Rules.

> **something onto a flame**[, w]hich we know not to be true[, a]nd that he's afraid that maybe he may have said that ... **[H]e doesn't want to be … lying and perjury** … **and my lawyer's like, 'you weren't under … you're not under oath**[.] … So[,] that's really what it is[, b]ut tha[t] they do want to help us, but that also on the flip side[,] … he doesn't want to … not lie[,] but … [to] say anything that could potentially hurt the case."

*See* October 24, 2024 Notarized Transcribed Voice Note, **Exhibit K** (emphasis added).

Kayla's voice note further reveals that Attorneys Ratzan and Giommoni developed a plan to convince Greg that his original understanding of the accident was wrong, and that what he told the Fire Marshal the morning of the accident was incorrect. According to Kayla, Attorney Giommoni planned to travel to Baltimore to meet personally with Greg and KF, show them videos, including a video prepared by Plaintiffs' retained expert, Scott Buske, purporting to demonstrate what he tells them is an "invisible flame," explain Consumer Product Safety Commission ("CPSC") findings relating to the October 2024 recall of the Gusar fire pit, and convince Greg that his observation and statement given to the Fire Marshal were wrong. Specifically, Kayla stated:

> So, nonetheless, Mario [Attorney Giommoni] is actually going to fly to Baltimore next week. He's trying to get in[]person with them. Basically, his thing is he's **going to spend time explaining to Kayla and Greg**, but mostly Greg[] obviously, what the CPSC found and … how it's happened before[ a]nd he's **gonna show videos of exactly what happened** and essentially lay out all the facts of the … case[ a]nd say to Greg, … [']of course you thought Nick put … fuel on a flame … **because there was an invisible flame**, one[, b]ut two, when he poured it, it was so fast that it exploded with a flame ball that that's what you saw.[']

*Id.* (emphasis added).

Kayla further explained that Attorney Giommoni intended to persuade Greg that his documented observations were wrong and that Plaintiffs' version of events was correct:

> and … basically, **Mario just needs to go there and … prove Greg** … but **massage it a little bit** and be[] like, [']hey, look, of course you feel like you saw what you saw[. … T]hat's what would be

6

normal to the, quote/unquote, eye because you don't know the facts[,] and here they are[,] and **this is really what happened**.[']
But they're not worried about it.

*Id*. (emphasis added).

Attorney Ratzan's communications further confirm that he was actively supplying Plaintiffs with  facts to support their allegations; on October 24, 2024, Attorney Ratzan sent Kayla a text message stating: "**Remember Nick waited until fire was out and gave it time to cool down**." *See* October 24, 2024 Text Message at p. 2,  **Exhibit L** (emphasis added).[3] That statement mirrored Plaintiffs' developing litigation-created theory that the fire pit was out before Nick poured alcohol on it. This narrative also directly contradicts the contemporaneous statements that Greg and KF provided to Fire Marshal Goins immediately after the accident, both of whom independently told him that the fire was "still burning" when Nick poured fuel on it.

On October 25, 2024, Kayla again acknowledged that Greg saw Nick pour fuel onto a flame, but then further asserted that Greg was wrong and expressly stated that Plaintiffs' lawyers needed to change Greg's statement by "**prov[ing] to him the facts**." Specifically, Kayla stated:

> Also. Idk if i told you guys but the lawyer spoke to Kayla the other day and she was saying **Greg's worried because he thought he did see Nick pour on a flame but in reality Greg just doesn't understand this fire jetting phenomena. So my lawyers are needing to prove to him the facts** and all the other shit. But they're not worried.

*See* October 25, 2024 text, **Exhibit M** (emphasis added).

### F. Plaintiffs' Counsel Improperly Showed the Ferraros Expert Video, Litigation-Generated Materials, and Post-Accident Materials While Wining and Dining Them the Night Before Their Depositions

---

[3] Plaintiffs' September 23, 2025 ESI production included numerous attorney-client communications between Plaintiff Kayla and prior counsel Attorneys Ratzan and Giommoni, including text threads expressly identifying counsel as "Stuart Ratzan lawyer."  After extensive briefing on Wayfair's Motion to Waive Privilege, the Court issued an Opinion and Order holding that Plaintiffs waived privilege as to all communications produced on September 23, 2025 because Plaintiffs failed to implement adequate review and quality-control procedures, and failed to conduct reasonable follow-up searches after learning privileged communications had been produced.  *See* ECF No. 277.

Consistent with Plaintiffs' efforts to persuade Greg that his contemporaneous understanding of the accident was incorrect, the night before their depositions, Plaintiffs' counsel, Attorney Giommoni, admittedly, wined and dined the Ferraros. *See* **Exhibit H**, Promislo Dec. at ¶¶ 6, 8.  During that dinner, Attorney Giommoni showed the Ferraros a series of expert-generated videos, including a video made by Plaintiffs' expert Scott Buske telling them that they were viewing an "invisible flame," which he represented was there, but that they could not see, as well as litigation materials, and post-accident CPSC recall materials. These materials and videos, all of which were created after the accident, could not have appropriately refreshed Greg and KF's recollections of what they actually observed on July 15, 2023.

Wayfair only learned of the materials after seeking Court intervention; during the March 20, 2025 discovery hearing, Attorney Ratzan initially represented to the Court that Wayfair already possessed every document and video shown to the Ferraros.  *See* ECF No. 117, March 20, 2025 Hearing Tr. at 39:17-25, 40:1-2, **Exhibit N**. However, near the conclusion of the hearing, Attorney Ratzan acknowledged for the first time, that his prior representation was not accurate and admitted that at least one previously undisclosed video had been shown to the witnesses. *See* ECF No. 117, March 20, 2025 Hearing Tr. at 56:16-25, 57:1-2, **Exhibit O**.

Following the hearing, Plaintiffs' counsel produced a flash drive containing materials that had been shown to Greg and KF before their depositions. Those materials included a video created by Plaintiffs' retained expert, Scott Buske, which had not been previously produced. The video appears to depict an exemplar Colsen fire pit, which Mr. Buske narrates and instructs that flames are burning although they are not visible. Specifically, Mr. Buske states:

> **You can hear it burning but you can't see any flame at all**. If I had background music playing I wouldn't be able to even hear it. It's still going. There's a little freeway noise in the background[,]

but flame makes a very different sound. This has been going for about ten minutes. **Completely invisible**.

*See* Notarized Transcription of Buske Video[4], attached as **Exhibit P**[5] (emphasis added).  The video Plaintiffs' counsel showed Greg and KF, before their depositions, explained to them why their contemporaneous statements were wrong, and mirrored the very same litigation-driven theories Plaintiffs discussed in their October 2024 communications.

The materials produced by Plaintiffs' counsel also included a video created by the Ontario Fire Marshal, which explains the phenomenon of flame jetting, and states:

> This is an important safety message from the Fire Marshal of Ontario. When entertaining friends and family outdoors, be careful when using ethanol-fueled appliances, commonly known as fire features or pots. A fire hazard called flame jetting can occur as fuel vapors are ignited when refueling an appliance that is not fully extinguished and a **flame is not readily visible**."

*See* Ontario Fire Marshal Video, **Exhibit BB**[6] (emphasis added). The Ontario Fire Marshal video is not connected to the July 15, 2023 accident, as it involved a different product, different circumstances, and post-accident educational materials concerning flame jetting. Nevertheless, Plaintiffs' counsel showed the video to Greg and KF before their depositions as part of their efforts to explain why these only eyewitnesses' contemporaneous statements made about the accident were wrong.

Plaintiffs' counsel also inappropriately showed the Ferraros the October 17, 2024 CPSC recall documents issued more than a year and four months after the accident. *See* CPSC Recall Notice, **Exhibit Q**. Those materials did not exist when the accident occurred and, therefore, could not have refreshed the witness' recollection regarding what they observed on July 15, 2023.

---

[4] The video recording, **Exhibit AA**, will be filed with the Court in accordance with the Local Rules.
[5] The Buske video was created for the purpose of this litigation by Plaintiffs' retained expert after the accident.
[6] The video recording, **Exhibit BB**, will be filed with the Court in accordance with the Local Rules.

Instead, Plaintiffs' counsel supplied Greg and KF with post-accident information concerning Plaintiffs' developing theory of liability in a campaign to change their testimony.

G. **Plaintiffs' Former Counsel Improperly Instructed and Educated the Ferraros About Invisible Flames and Flame Jetting Before Their Depositions**

During their depositions, both Greg and KF acknowledged that they had no knowledge of flame jetting and invisible flames on the date of the accident. Both also admitted that they learned about those concepts from Plaintiffs' counsel after the accident. KF testified that her understanding of the accident at the time of her deposition was informed by information she learned after the accident. When asked whether her recollection was better on the night of the accident or at the time of her deposition, KF testified: "**I think I have more information now** than I did on that night, not having any experience with fire pits or … flame jetting, so I would say yes." *See* KF Tr. at 129:1-7, **Exhibit R**. KF further confirmed that she did not know about invisible flames on the date of the accident. *See* KF Tr. at 137:5-21, 138:1-2, **Exhibit S**. She also confirmed that Attorney Giommoni showed her videos before her deposition and discussed invisible flames: "Mario … shared a video with us also of something that seemed very similar to what we had seen." *See* KF Tr. at 133:17-18, **Exhibit T**. KF further testified:

> [H]e shared the video and the fact that … this is something that can occur when the fire pit is … porous … that is possible that it can happen … generally, that the flame can burn invisibly.

*See* KF Tr. at 134:4-7, **Exhibit R**. Greg also confirmed that Attorney Giommoni taught him about the concept of flame jetting during an initial dialogue and explained "what flame jetting was." *See* Greg Tr. at 82:2-15, **Exhibit U**.

Following their meetings with Plaintiffs' counsel, including counsel showing them the videos and CPSC materials detailed above, both witnesses repeatedly testified that the flame was "invisible," and "not visible," to be consistent with Plaintiffs' litigation-created flame-jetting

theory. *See* KF Tr. at 16:4-5, 40:12-15, 41:2-3, 92:13-18, 118:5-18, 119:7-21, 120:1, 123:4-21, 130:1-3, **Exhibit V**; *See also* Greg Tr. at 92:1-3, **Exhibit W**.

H. **Plaintiffs' Former Counsel Used Greg and KF's Coached Testimony to Challenge Fire Marshal Goins' Contemporaneous Report and Findings**

After eliciting improperly coached testimony from Greg and KF, which contradicted the statements they provided to the Fire Marshal, Plaintiffs' former counsel then attempted to use that testimony to challenge Fire Marshal Goins' contemporaneous findings concerning the cause of the accident. Attorney Giommoni repeatedly represented to Fire Marshal Goins, during his deposition, that Greg and KF testified they did not see a visible flame, and that they would have stopped Nick from pouring alcohol on the fire pit had they observed one. Attorney Giommoni stated:

> I'll represent to you, sir, that both Greg and Kayla Ferraro both testified that had they seen a visible flame when Nicholas Hominski was refueling the fire pit, they would have stopped him and not allowed him to do it.

*See* Fire Marshal Goins' Tr. at 193:4-21, **Exhibit X**. Attorney Giommoni further represented:

> [A]t the time that Nicholas Hominski was pouring the liquid fuel into the fire pit, both Greg and Kayla Ferraro told me and testified under oath ... that there was not a visible flame that they saw at the time ....

*Id*. at 193:18-194:5.

After summarizing the Ferraros' coached testimony for Fire Marshal Goins, Attorney Giommoni attempted to persuade him that the Ferraros' statements to him the same morning of the accident could be reconciled with Plaintiffs' theory that there had been an invisible flame:

> My question to you is, sir ... isn't it entirely possible, sir, that the Ferraros[,] and the assumption here in this case that there was a flame burning but that the flame could have been burning invisibly?

*Id*. at 195:3-9. Fire Marshal Goins repeatedly rejected Attorney Giommoni's efforts, again reaffirming the statements Greg and KF provided immediately after the accident. Fire Marshal

11

Goins testified: "**[B]oth of them told me it was either still burning or almost out**." *Id*. at 195:19-20. When Attorney Giommoni continued pressing the issue, Fire Marshal Goins again reaffirmed his contemporaneous findings:

> **Mr. Ferraro told me [that] the fire was almost out but still burning. Mrs. Ferraro told me, started [to] refill the device while it was still burning.** ...

*Id*. at 197:12-15 (emphasis added). Fire Marshal Goins ultimately reiterated that both witnesses reported the fire pit remained burning when Nick poured fuel on it:

> All I can tell you is in my report … **both of them said still burning. … [B]oth of them acknowledged that it was still burning while it was being refueled**."

*Id*. at 199:2-8 (emphasis added).

> I. **Plaintiffs' Communications With Their Former Counsel Reflect Continued Efforts to Improperly Control the Narrative of the Accident**

The conduct described above was not limited to Plaintiffs' efforts to persuade Greg and KF that their statements given to the Fire Marshal were wrong, their use of expert-generated materials and post-accident recall information to influence the Ferraros' testimony, or their subsequent attempts to use that revised testimony to challenge Fire Marshal Goins' contemporaneous findings. Plaintiffs produced additional communications which reflect not just counsel's, but their own efforts to control the narrative of the accident and the information provided to Wayfair. While gathering documents for production in November 2024, Kayla forwarded a series of text messages to Attorneys Ratzan and Giommoni and explained that: "**[h]ere are some random texts when [I] search 'Wayfair[.]'**" *See* email chain, **Exhibit Y** (emphasis added). After reviewing those materials, Attorney Ratzan responded:

> **There is no way we are going to give the defendants these texts**, but you also need to STOP putting anything like this in writing to anyone other than your lawyers and your husband going forward.

*Id.* (emphasis added). While the email chain was ultimately produced by Plaintiffs' current counsel in September 2025, the screenshots and text messages attached to Kayla's email still have not been produced. Although the produced emails establish the existence of additional communications concerning this litigation, the text messages referenced have been improperly withheld.

III.   **LEGAL ARGUMENT**

A.   **Fraud on the Court Occurs Where a Party Deliberately Undertakes a Scheme Designed to Corrupt the Truth-Seeking Function of the Judicial Process.**

Federal courts possess inherent authority to protect the integrity of the judicial process and to sanction litigants who engage in conduct designed to interfere with the court's ability to fairly adjudicate a dispute. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-46 (1991); *see also Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1335 (11th Cir. 2002) ("Courts have the inherent authority to control the proceedings before them, which includes the authority to impose 'reasonable and appropriate' sanctions"). That authority includes the power to dismiss an action where a party has engaged in fraud on the court. *Chambers*, 501 U.S. at 44-46. Fraud on the court occurs where a party "has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter." *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989). Florida courts have adopted the same standard and recognize that dismissal is appropriate where a litigant intentionally undertakes a scheme designed to interfere with the fair adjudication of a case. *Cox v. Burke*, 706 So. 2d 43, 46-47 (Fla. 5th DCA 1998); *Arzuman v. Saud*, 843 So. 2d 950, 952 (Fla. 4th DCA 2003). The doctrine is not limited to fabricated documents or perjured testimony. Rather, it reaches any deliberate course of conduct designed to corrupt the evidentiary record upon which the court must rely. *See Vargas v. Peltz*, 901 F. Supp. 1572, 1581-82 (S.D. Fla. 1995) (fraud on the court exists where a party has set in

motion an unconscionable scheme calculated to improperly influence the trier of fact or unfairly hamper the presentation of an opposing party's claim or defense). The Court's focus is not merely on whether false evidence was ultimately presented, but whether a litigant engaged in conduct designed to subvert the truth-seeking process itself.

The Court's inherent authority encompasses not only the power to exclude improperly obtained evidence, but also the power to dismiss an action where a party "commits perjury or . . . doctors evidence" relating to a pivotal issue in the case. *Quiroz v. Superior Bldg. Maint., Inc.*, 2008 U.S. Dist. LEXIS 61534, at *15-16 (S.D. Fla. Aug. 12, 2008) (*quoting Qantum Commc'ns Corp. v. Star Broad., Inc.*, 473 F. Supp. 2d 1249, 1269 (S.D. Fla. 2007)). Because dismissal is a severe sanction, fraud on the court must be established by clear and convincing evidence. *Cox*, 706 So. 2d at 46-47; *Vargas*, 901 F. Supp. at 1581-82. Where that burden is satisfied, however, dismissal is appropriate because "[t]he integrity of the civil litigation process depends on truthful disclosure of facts." *Cox*, 706 So. 2d at 47.

B. **The Law Permits Witness Preparation, But Specifically Prohibits Efforts to Alter a Witness's Testimony.**

There is nothing improper about an attorney preparing a witness for deposition, including reviewing documents with witnesses, discussing anticipated areas of questioning, and assisting witnesses in organizing and presenting their recollections. However, witness preparation has strict limits: an attorney may prepare a witness to testify truthfully, yet an attorney may not alter the witness' recollection, supply facts the witness did not previously possess, or persuade the witness that his or her original understanding of events was wrong.

As the court explained in *Hall v. Clifton Precision*, the purpose of a deposition is to discover "what a witness saw, heard, or did—what the witness thinks." 150 F.R.D. 525, 528 (E.D. Pa. 1993). A deposition serves the important function of preserving a witness's recollection before

it is altered by "intervening events, other discovery, or the helpful suggestions of lawyers." *Id*. A lawyer therefore may not "help[] the witness to formulate answers" or attempt to create "a legally convenient record." *Id*. Rather, "[t]he witness comes to the deposition to testify, not to indulge in a parody of Charlie McCarthy, with lawyers coaching or bending the witness's words to mold a legally convenient record. It is the witness—not the lawyer—who is the witness." *Id*.

The distinction between proper witness preparation and improper witness coaching has long been recognized. More than a century ago, the New York Court of Appeals explained that **"[t]he lawyer's duty is to extract the facts from the witness, not to pour them into him; to learn what the witness does know, not to teach him what he ought to know."** *In re Eldridge*, 37 N.Y. 161, 171 (1867) (emphasis added). Similarly, the Supreme Court has recognized that an attorney "must respect the important ethical distinction between discussing testimony and seeking improperly to influence it." *Geders v. United States*, 425 U.S. 80, 90 n.3 (1976). Consistent with that principle, the American Bar Association recently explained that witness preparation becomes improper when an attorney encourages a witness to adopt facts that are not the witness' own, or otherwise influences the substance of the witness's testimony. ABA Formal Op. 508 (2023). The Florida Rules of Professional Conduct likewise prohibit attorneys from counseling or assisting a witness to testify falsely or from offering evidence the lawyer knows to be false. *See* Fla. R. Prof. Conduct 4-3.3(a)(4); 4-3.4(b).

Accordingly, while attorneys may prepare witnesses to testify, they may not attempt to change a witness' understanding of the underlying events, supply the witness with facts that did not form part of the witness' original recollection, or persuade the witness to abandon a contemporaneous account in favor of a version of events supplied by counsel, all of which happened here.

C. **Plaintiffs and Their Former Counsel Acted Together to Undertake an "Unconscionable Scheme" to Alter the Only Two Eyewitnesses' Testimony**

Plaintiffs and their former counsel acted together to undertake an "unconscionable scheme" to alter the testimony of the Ferraros, the only independent eyewitnesses concerning the central liability issue in this case by keeping Wayfair's counsel from contacting these eyewitnesses, meeting with and wining and dining them before their depositions, and, most critically, showing them post-accident documents and litigation-created videos in an effort to encourage them to testify to a different version of events than they had previously relayed to the Fire Marshal. *See Aoude*, 892 F.2d at 1118. This was not witness preparation, but instead was a calculated effort to convince Greg and KF that their contemporaneous statements given to the Fire Marshal were wrong, replace their understanding with Plaintiffs' litigation-created narrative based on information and videos not otherwise related to their observations and recollection, and then use their altered recollection of events to advance Plaintiffs' claims. Such conduct constitutes an intentional scheme designed to interfere with the fair adjudication of this matter, corrupt the evidentiary record, and create the very type of "legally convenient record" condemned by *Hall*.[7] *See Cox*, 706 So. 2d at 46-47; *Vargas*, 901 F. Supp. at 1581-82; *Hall*, 150 F.R.D. at 528.

Rather than preparing Greg and KF to testify about what they observed on July 15, 2023, Plaintiffs and their former counsel improperly sought to convince them that their observations were mistaken. *See In re Eldridge*, 82 N.Y. at 171; *Hall*, 150 F.R.D. at 528. The record reflects repeated efforts to replace Greg's contemporaneous statement that the fire pit was "almost out but still burning," not by testing its accuracy, but by attempting to **"pour facts into him," to teach**

---

[7] Plaintiffs may contend that this Court's Order denying application of the crime-fraud exception resolves the issues presented here. It does not. That Order addressed whether Wayfair made the prima facie showing necessary to pierce the attorney-client privilege under the crime-fraud exception, a distinct inquiry governed by a different legal standard. *See* ECF No. 277 at 16-22. This Motion instead seeks dismissal based on fraud on the Court and relies on a substantially more developed evidentiary record, including evidence of Plaintiffs' own participation in the misconduct.

**him** that he misunderstood what he observed because he did not understand invisible flames and flame jetting at the time of the accident. Kayla personally discussed the need to "prove" facts to Greg, explained to others that Greg's understanding of the accident was wrong, and described counsel's plans to persuade him that what he believed he observed was not what actually occurred. In other words, counsel did not seek to learn what the eyewitnesses knew; instead, they sought to replace the eyewitnesses' own understanding of the accident with a new explanation developed during litigation. That is precisely the type of conduct condemned by *Hall* and *Eldridge*, which recognize that counsel's role is to extract facts from a witness, not supply them. *Id*.

None of the materials shown to Greg and KF, including litigation-created expert demonstrations, governmental safety videos, post-accident recall materials, and other information that neither witness possessed on July 15, 2023 could have possibly refreshed these witnesses' recollections because they were not part of either witness's contemporaneous knowledge or observations. Instead, they supplied Greg and KF with new information, including invisible flames and flame jetting, that later appeared in their testimony. The purpose of those materials was not to preserve testimony, but to change these only witnesses' recollection and testimony.

The witness' contemporaneous statements confirm that the fire pit was **"still burning"** when Nick poured isopropyl alcohol on it. Counsel's and Plaintiffs' subsequent efforts to supplant the witness' statements with contradictory testimony about invisible flames and flame jetting constituted deliberate conduct designed to corrupt the evidentiary record. *See Vargas*, 901 F. Supp. at 1581-82. Fire Marshal Goins' Report contemporaneously documents that Greg independently reported to him that **the fire pit was "almost out but still burning,"** and KF reported that Nick began refilling the fire pit "**while it was burning**." Fire Marshal Goins Report concludes that the accident occurred when liquid fuel was poured onto an open flame. The contemporaneous medical

17

records all reflect that alcohol was poured onto a burning fire pit. Rather than accepting those accounts, Kayla repeatedly characterized Greg's contemporaneous statement as wrong, told others he simply did not understand invisible flames and flame jetting, and participated in a concerted effort to substitute testimony consistent with Plaintiffs' theory of liability. Plaintiffs did not merely challenge unfavorable evidence; they attempted to rewrite it.

Then, seeking to leverage the improperly coached testimony that they obtained from the Ferraros, Plaintiffs' counsel furthered the scheme by repeatedly presenting Greg and KF's changed testimony to Fire Marshal Goins in an effort to persuade him that the Ferraros never told him they observed a visible flame, as confirmed in his Report. *See* **Exhibit A**.  While Fire Marshal Goins repeatedly rejected that characterization and reaffirmed that both eyewitnesses independently told him the fire pit was still burning when Nick poured alcohol on it, the improper attempts to leverage knowingly false testimony to influence another witness' testimony cannot be ignored.

Plaintiffs' own communications demonstrate that Kayla actively participated in discussions regarding changing Greg's testimony and relayed counsel's plans to convince him that his contemporaneous account was wrong. Attorney Ratzan expressly stated that certain text messages would not be produced despite their apparent relevance to this litigation. Although Plaintiffs later produced the email exchange discussing those communications, the underlying text messages themselves were never produced.  Such conduct is consistent with an intentional scheme designed to interfere with the fair adjudication of this matter. See *Cox*, 706 So. 2d at 46-47.

Courts impose the ultimate sanction of dismissal where misconduct is directed at the central factual issues in the case, as here. In *Quiroz*, the Southern District of Florida dismissed the action after finding that counsel had engaged in witness tampering by attempting to procure favorable testimony through improper means. The court concluded that such conduct threatened "the

18

public's trust in our system of justice" and warned that litigants should not be permitted to "abuse the judicial process and opposing parties by fabricating evidence concerning the core of their case and simply pay a fine to absolve their misdeeds." *Quiroz*, 2008 U.S. Dist. LEXIS 61534, at *26. Likewise, in *Rusos v. Primo Pizza, Inc.*, 2013 U.S. Dist. LEXIS 203668, at *5 (S.D. Fla. Mar. 21, 2013), the court dismissed the plaintiff's claims after finding efforts to manipulate evidence and witness testimony, emphasizing that the misconduct was "closely intertwined with the merits of this action," a circumstance that "underscores the severity of the sanction that must be imposed." Similarly, in *Frieson v. Delta Airlines, Inc.*, 2022 U.S. Dist. LEXIS 22587 (N.D. Ga. Feb. 8, 2022), the court dismissed the plaintiff's claims after finding repeated perjury and fabricated evidence concerning the central factual issues in the case. The court emphasized that dismissal is particularly appropriate where a party "commits perjury or . . . doctors evidence" relating to the "pivotal or linchpin issue in the case," and concluded that lesser sanctions were inadequate because the misconduct infected "almost every key fact needed to adjudicate" the plaintiff's claims. *Id.* at *27-29. The same concerns are present here, as Plaintiffs did not merely acquiesce in their former counsel's conduct, but rather worked with their former counsel to target the only independent eyewitnesses' testimony regarding the central liability issue in this case. Through her own text messages, voice note, and emails, Kayla Hominski repeatedly asserted that Greg's contemporaneous understanding of the accident was wrong, discussed counsel's plans to "prove" facts to him and "massage" his understanding of what occurred, and personally relayed counsel's efforts to convince him that what he believed he observed was not what actually happened. Together, Plaintiffs and their former counsel supplied the Ferraros with expert-created videos, post-accident documents, and concepts they admittedly did not possess, and which did not even exist, on the date of the accident, obtained testimony consistent with Plaintiffs' theory of liability,

19

and then used that testimony to challenge the contemporaneous evidentiary record. As in *Quiroz*, *Rusos*, and *Frieson*, the misconduct here was directed at the core merits of the case and infected the evidence the jury will be asked to evaluate. Here, Greg and K.F.'s altered testimony goes directly to how the accident occurred. As in *Quiroz*, *Rusos*, and *Frieson*, the misconduct here was directed at the core merits of the case and infected the evidence the jury will be asked to evaluate.

IV. **CONCLUSION**

For the foregoing reasons, Defendant Wayfair LLC respectfully requests that this Honorable Court dismiss Plaintiffs' Amended Complaint with prejudice pursuant to the Court's inherent authority to sanction litigation misconduct and fraud on the court. In the alternative, Wayfair respectfully requests that the Court strike the testimony of Greg and Kayla Ferraro concerning invisible flames, flame jetting, and other concepts supplied after the accident; preclude Plaintiffs from introducing or relying upon testimony obtained through their witness coaching efforts and further exclude any expert opinions derived from or dependent upon such testimony, and, in the alternative, provide an appropriate adverse inference instruction at trial; and award such other and further relief as the Court deems necessary and proper.

**CERTIFICATE OF GOOD FAITH CONFERENCE**

Pursuant to Local Rule 7.1(a)(3), undersigned counsel certifies that counsel for Defendant Wayfair LLC conferred with counsel for Plaintiffs on July 6, 2026, in a good-faith effort to resolve the issues raised in this Motion. The parties were unable to resolve the issues, and Plaintiffs oppose the relief requested herein.

Respectfully submitted,

**LONDON FISCHER LLP**
*Counsel for Defendant Wayfair LLC*

20

*/s/ Jacqueline Promislo*

Jacqueline Promislo, Esquire (*pro hac vice*)
123 South Broad Street, Suite 1320
Philadelphia, PA  19109
Tel: (215) 875-1000
Email: jpromislo@londonfischer.com

*/s/ John J. McDonough*

John J. McDonough, Esquire (*pro hac vice*)
59 Maiden Lane, 39th Floor
New York, NY 10038
Tel: (212) 972-1000
Email: jmcdonough@londonfischer.com

Date: July 7, 2026

*/s/ Jonathan L. Kranz*

Jonathan L. Kranz, Esquire, FL Bar No. 1044940
100 SE 2nd Street, Suite 2000
Miami, FL  33131
Tel: (305) 720-2000
Email: jkranz@londonfischer.com